(No. 49421.—

LOIS A. CHURCHILL, Indiv. and as Adm'r, Appellee, v. NORFOLK & WESTERN RAILWAY COMPANY *et al.*—(Norfolk & Western Railway Company, Appellant.)

*Opinion filed Oct. 6, 1978.—Rehearing denied Dec. 1, 1978.*

132

Giffin, Winning, Lindner, Newkirk, Cohen, Bodewes & Narmont, of Springfield, and James P. Reedy & Associates, Ltd., of Chicago (Richard J. Durbin and James P. Reedy, of Chicago, and Alfred F. Newkirk, of Springfield, of counsel), for appellant.

Thomas F. Londrigan, of Londrigan & Potter, P.C., of Springfield, and Robert H. Brunsman, of Brunsman, Crain, Kenney & Pearson, of Springfield, for appellee.

Francis D. Morrissey and Edward J. Zulkey, of Baker & McKenzie, of Chicago, for *amici curia* Atchison, Topeka & Santa Fe Ry. Co. *et al.*

Leonard M. Ring, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

MR. JUSTICE MORAN delivered the opinion of the court:

This action resulted from the death of Paul Churchill, who was a passenger in an automobile driven by James R. Cravens when the vehicle stalled on the tracks of the Norfolk & Western Railway, and was struck by one of its trains. Plaintiff, Lois A. Churchill, individually and as administrator of her husband's estate, filed an eight-count amended complaint against Norfolk & Western Railway, James R. Cravens, and Chrysler Motors Corporation. Only Lois A. Churchill (plaintiff) and Norfolk & Western Railway (defendant) are involved in this appeal.

Counts I, II, V, VII and VIII went to the jury. Counts I and II, alleging negligence and wilful and wanton misconduct, respectively, were brought by plaintiff as administrator against defendant under the Wrongful Death Act (Ill. Rev. Stat. 1969, ch. 70, par. 1 *et seq.*). In count V, plaintiff-administrator charged Cravens with wilful and wanton misconduct. Count VII was brought by plaintiff *individually* against defendant under the Public Utilities Act (Ill. Rev. Stat. 1969, ch. 111 2/3, par. 77), to recover $5,000 in hospital, medical and funeral expenses for which she became liable under the family expense act (Ill. Rev. Stat. 1969, ch. 68, par. 15). She alleged violations of the Public Utilities Act and Rule 205 of the Illinois Commerce Commission (ICC). In count VIII she repeated the allegations of count VII and sought, in addition to the hospital, medical and funeral expenses, $3 million in punitive damages for the wilful violation of the Public Utilities Act and the ICC rule.

The jury returned a verdict in favor of plaintiff-administrator for $45,000 under count I for negligence, and, by separate verdict, for $45,000 under count II for

wilful and wanton misconduct. The jury's verdict on count V exonerated Cravens. On count VII, the jury fixed the amount of the compensatory damage award to plaintiff individually at $1,600. On count VIII, however, it fixed the verdict on compensatory damages at $45,000 and included an additional $600,000 in punitive damages. The trial court allowed the verdicts on counts I, V and VII to stand. It entered judgments for defendant, notwithstanding the verdicts, on counts II and VIII.

A majority of the appellate court affirmed in part and reversed in part. (46 Ill. App. 3d 781.) It remanded the cause to the circuit court of Sangamon County with directions to enter a single judgment for $45,000 pecuniary damages on behalf of plaintiff as administrator, a judgment for plaintiff individually in the amount of $1,600 for funeral expenses, and a judgment for plaintiff individually for $600,000 in punitive damages.

On its own motion, the appellate court, pursuant to section 4(c) of article VI of the 1970 Illinois Constitution and Supreme Court Rule 316 (58 Ill. 2d R. 316), issued a certificate of importance to this court in both this case and a companion case, *National Bank of Bloomington v. Norfolk & Western Ry. Co.* (1977), 46 Ill. App. 3d 757, *aff'd* (1978), 73 Ill. 2d 160.

Our recitation of the facts is limited to those which frame the issues before us.

At 7:20 p.m. on March 17, 1970, Paul Churchill was a passenger in the front seat of owner-operator Cravens' 1969 Dodge Charger. As Cravens' auto approached the Dawson, Illinois, railroad crossing (which was equipped with bells and flasher signals), Cravens looked to the east, but his view was obstructed by a line of defendant's boxcars stored on sidetracks at a distance beginning 414 feet east of the crossing. As Cravens drove onto the tracks, he noticed a train approaching from the east at 60 miles per hour. His car stalled and, about the same moment, the

crossing's flasher signals began operating. Cravens made several unsuccessful attempts to start the car, placed the car in gear and tried to move the vehicle by using the starter, attempted to warn his passenger of the on-rushing train, and, finally, abandoned his car. Immediately thereafter, the train struck the car, which exploded into flames. Churchill was killed instantly. When his body was found, it was still secured in the car by the seat belt.

According to the testimony of a State trooper who investigated the accident, Cravens reported that the train was 600 feet to the east of the crossing when he first saw it. However, in response to defendant's interrogatory, Cravens stated that the train was approximately at the next crossing to the east (one-half mile away) when his car stalled on the tracks. This interrogatory was not read to the jury. Both the train's engineer and its fireman concurred that the car was 500 or 600 feet away when they first saw it on the tracks. The brakeman on the train testified that the car could be seen on the tracks for one-quarter to one-half mile prior to impact, but that it was not until the train was within 500 or 600 feet of the auto that the train crew realized the car was stalled.

Another auto, traveling in the opposite direction, crossed the tracks immediately prior to Cravens' auto. That driver testified that he heard no train whistle or bell to signal the approach of a train, and that the flasher lights were not operating when Cravens' car approached the crossing. The train engineer testified that the whistle was sounded when the train was 900 feet from the crossing and that the engine bell was ringing.

It was shown that the defendant had been repeatedly warned of the dangerous visual obstruction created by the boxcars being stored near the crossing. On numerous occasions and once by certified letter on October 7, 1966, a neighboring school district communicated to the defendant that its bus drivers could not see up and down the

tracks before crossing. The mayor of Dawson testified that he had complained to defendant about the same obstructions. Upon receiving complaints, defendant temporarily rectified the situation but then resumed the dangerous storage practice.

Of the myriad issues presented, we first review that which prompted the appellate court to certify these companion cases: In an action arising from the accident-related death of a person injured, are both compensatory and punitive damages recoverable under section 73 of the Public Utilities Act?

Section 73 of the Public Utilities Act provides:

> "In case any public utility shall do, cause to be done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or thing required to be done *either by any provisions of this Act or any rule, regulation, order or decision of the Commission, issued under authority of this Act, such public utility shall be liable to the persons or corporations affected thereby for all loss, damages or injury caused thereby or resulting therefrom,* and if the court shall find that the act or omission was wilful, the court may in addition to the actual damages, award damages for the sake of example and by the way of punishment. *An action to recover for such loss, damage or injury may be brought in any court of competent jurisdiction by any person or corporation."* (Emphasis added.) (Ill. Rev. Stat. 1969, ch. 111 2/3, par. 77.)

Defendant was found to have violated Rule 205 of General Order 138 of the ICC. The rule requires a railroad to keep its right-of-way reasonably clear of unnecessary obstructions for a minimum of 500 feet from every grade crosssing at which an obstruction would materially obscure approaching trains from the view of travelers on the highway.

Defendant initially seeks to dispose of the question by asserting that the statutory remedy in section 73 does not apply to personal injury actions. It contends that the

Public Utilities Act is directed at regulating rates and services of public utilities, and that, consequently, section 73 is intended to provide a remedy only for such abuses as overcharging and preferential rates and not for safety violations at railroad crossings. We fail to find any substantiation whatsoever for this contention.

The Public Utilities Act, designed in part to promote public safety by public utilities, was originally enacted in 1913. (1913 Ill. Laws 459.) By 1925, this court had resolved that the Act directly sought to secure the public's protection at the intersections of streets and railroads. (*Village of Atwood v. Cincinnati, Indianapolis & Western R.R. Co.* (1925), 316 Ill. 425.) In 1937, the ICC, pursuant to its authority under the Act, adopted General Order 138. That general order specifically imposed rules, regulations and requirements "relating to construction, maintenance, marking and protection of crossings of Highways and Railroads." (See *American National Bank & Trust Co. v. Pennsylvania R.R. Co.* (1964), 52 Ill. App. 2d 406, 429, 434.) The Seventh Circuit Court of Appeals has twice held that section 73 of the Public Utilities Act clearly provides a remedy for personal injuries which result from a violation of ICC rules concerning public safety at railroad crossings. (*Lippincott v. Wabash R.R. Co.* (7th Cir. 1961), 295 F.2d 577; *Rucker v. Wabash R.R. Co.* (7th Cir. 1969), 418 F.2d 146.) We are impelled by the twin forces of statutory clarity and judicial precedent to conclude that personal injury actions, arising out of the violation of the ICC's rules on public safety at railroad crossings, are cognizable under section 73 of the Public Utilities Act.

Defendant contends that even if section 73 of the Public Utilities Act recognizes a cause of action against a public utility for violations which result in personal injury, no cause of action exists when such violations result in death. We believe defendant has reached this anomalous conclusion by confusing plaintiff's causes of action under

the Public Utilities Act (counts VII and VIII) with the wrongful death actions brought in counts I and II. The causes of action are separate and distinct.

Counts VII and VIII were brought by plaintiff in her own behalf, not as a representative of the decedent as would be true in a wrongful death action. Plaintiff, on the basis of the financial injury she personally incurred, sought both compensatory and punitive damages directly under the Public Utilities Act. In order to avoid confusion with the wrongful death counts, counts VII and VIII should be regarded as actions brought against the defendant, whose wrongful and wilful violation of the Public Utilities Act, resulting in another's death, caused injury to plaintiff.

Twenty years ago there would have been no such distinction inasmuch as the Wrongful Death Act was deemed to be the exclusive remedy against a defendant whose wrongful act resulted in another's death. (*Holton v. Daly* (1882), 106 Ill. 131, 140.) In 1960, that proposition was rejected because it was based on the anachronistic and misunderstood principle that there is no right of recovery after the death of an injured person. (*Saunders v. Schultz* (1960), 20 Ill. 2d 301, 306; see *Murphy v. Martin Oil Co.* (1974), 56 Ill. 2d 423, 426.) In *Saunders,* this court clarified the distinction.

> "[T]here is presently no legally cogent reason for denying a spouse the right to recover for medical and funeral expenses incurred on behalf of a mate who was wrongfully injured or killed. The rule denying such recovery originated as a corollary of the archaic common-law rule that there could be no recovery for the death of a human being, which is no longer the law. Moreover, under the present status of the law, a surviving spouse is personally liable under family expense statutes for the medical and burial expenses incurred on behalf of a husband or wife. Viewing the situation

realistically, *this liability of the surviving spouse for such expenses constitutes very real damages.* Since that liability results from defendant's tortious conduct, it is only legally sound, and in accordance with basic negligence principles, that the burden of such damages should fall, not on the innocent victim, but upon the tortfeasor." (Emphasis added.) *Saunders v. Schultz* (1960), 20 Ill. 2d 301, 309-10.

The *Saunders* decision stands for the general proposition that actions independent of the Wrongful Death Act may be brought against a defendant whose wrongful act resulted in another's death. *Saunders* itself permitted a spouse to recover, under the common law, for the medical and funeral expenses of her deceased husband—expenses for which she was liable under the family expense act (Ill. Rev. Stat. 1955, ch. 68, par. 15). In *Murphy v. Martin Oil Co.* (1974), 56 Ill. 2d 423, which expressly overruled *Holton v. Daly,* this court held that the administrator of the decedent's estate could, independent of the Wrongful Death Act, bring an action for damages which would encompass decedent's lost wages, lost property, and pain and suffering endured during the nine days between injury and death.

It is clear that, under the Public Utilities Act, plaintiff herein is a person "affected" by defendant's wrongful act in that she individually suffered "loss, damages or injury" in an amount which the jury determined to be $1,600. There is no indication that persons "affected" by the wrongful act are only those who are physically injured as the proximate result of the wrongful act. Generally, a person "affected" by a wrongful act is one who shows a direct personal interest in the matter as opposed to one whose interest is merely in common with that of the general public. The issue may be expressed as one of standing. Plaintiff has standing to bring her action against the defendant under

the Public Utilities Act because defendant's wrongful act caused her to sustain precisely the "very real damages" which this court countenanced in *Saunders*. Plaintiff's financial loss is independent of the fatal injury which her husband sustained and is to be compensated separately under the Act. Therefore, we hold that a spouse may recover under the Public Utilities Act those compensatory damages for which she becomes liable as a proximate result of defendant's wrongful act.

The Act also provides that "if the court shall find that the act or omission was wilful, the court may in addition to the actual damages, award damages for the sake of example and by the way of punishment." (Ill. Rev. Stat. 1969, ch. 111 2/3, par. 77.) Despite the plain language of the Act, defendant contends that, even if plaintiff is entitled to compensatory damages under the Act, she may not recover punitive damages. Defendant refers to various legislative enactments in an attempt to show that whenever the legislature contemplated a cause of action for death, it limited recovery to compensatory or pecuniary damages. (See Liquor Control Act (Ill. Rev. Stat. 1977, ch. 43, par. 135); Structural Work Act (Ill. Rev. Stat. 1977, ch. 48, par. 69); Wrongful Death Act (Ill. Rev. Stat. 1977, ch. 70, par. 2); and Coal Mining Act (Ill. Rev. Stat. 1977, ch. 96½, par. 1007).) Each of these enactments compensates the surviving spouse and heirs for the loss of life of the decedent. We reemphasize that plaintiff here is seeking punitive damages directly under the Public Utilities Act on the basis of the financial loss she personally incurred, not on the basis of the loss of life of her husband. Therefore, defendant is incorrect in its reliance upon the compensatory or pecuniary aspects of legislation directed toward compensating a spouse for loss of life. The Public Utilities Act expressly authorizes additional recovery by way of punitive damages *to any person affected* by defendant's wilful and wrongful conduct.

It is not the intent of this court either to condemn or to advance the recovery of punitive damages in tort cases. Neither is it our function to rewrite the product of the General Assembly so as to deny punitive damages to a plaintiff whose compensable injury resulted from the very type of misconduct which the legislature hoped to eradicate by authorizing punitive recovery. The record in this case clearly reveals that the substantial punitive award was made to punish a defendant railroad company that had utterly disregarded pleas of local officials and citizens to remove its dangerous obstructions and to reassure the public that such indifference to public safety would not be repeated by the defendant or other railroad companies in the future. It would be incongruous indeed to preclude, as defendant suggests, the recovery of punitive damages by a plaintiff who has sustained compensable injury as a result of defendant's wilful and wrongful act merely because defendant's act also resulted in the death of plaintiff's husband. We therefore hold that both compensatory and punitive damages may be recovered against a defendant whose wrongful and wilful violation of the Public Utilities Act, resulting in another's death, caused injury to the plaintiff.

During trial, defendant attempted to call co-defendant Cravens as an adverse witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1969, ch. 110, par. 60), and to have Cravens' answers to certain interrogatories read to the jury as admissions against Cravens' interest. Plaintiff objected on two grounds. First, she insisted that Cravens' testimony was being introduced not to shift responsibility for the accident to Cravens, but to suggest that decedent, Paul Churchill, was guilty of contributory negligence. Second, she contended that Cravens' testimony would not be competent against plaintiff as administrator because section 2 of the Evidence Act (Ill. Rev. Stat. 1969, ch. 51, par. 2) prohibits testimony of any interested party from

being used against an administrator of a decedent's estate. The trial court ruled in accord with plaintiff's second position and permitted Cravens' testimony to be admitted only against plaintiff individually and not against plaintiff as administrator in counts I, II and V. Defendant posited that it was entitled to cross-examine Cravens fully under all counts and made an offer of proof.

During the conference on jury instructions, plaintiff offered to withdraw her objection and to permit defendant to reopen its case for the purpose of calling Cravens under section 60. Defendant declined to do so, contending that the prejudice could not, at that point, be overcome by allowing it to reopen its case and present Cravens' testimony. The trial court noted in its memorandum opinion that plaintiff's offer to withdraw the objection preceded closing arguments, and expressly found that its earlier ruling on the objection had not so prejudiced the defendant that it could not have been cured at that point. Certainly, it was well within the court's discretion to allow defendant's case to be reopened prior to closing argument. We agree with the trial and appellate courts that, under the circumstances, the assignment of error became moot when plaintiff agreed to withdraw all objections to Cravens' competency and the trial court provided defendant the opportunity for such evidence to be considered by the jury.

Defendant urges that it was error to admit evidence that on prior occasions railroad cars had been left within 500 feet of the crossing and to admit evidence of previous accidents which had occurred at the same crossing under somewhat similar conditions. Its position is that the only relevant issue was whether, at the time of the instant accident, there was a violation of the ICC's Rule 205 which prohibited obstructions within 500 feet. We disagree. We acknowledge that the evidence of prior violations of Rule 205 and of accidents resulting therefrom

could not be admitted for the purpose of showing independent acts of negligence. (*Moore v. Bloomington, Decatur & Champaign R.R. Co.* (1920), 295 Ill. 63, 67; *Evans v. Pennsylvania R.R. Co.* (3d Cir. 1958), 255 F.2d 205, 209-10; Annot., 70 A.L.R.2d 167, 188 (1960).) Nevertheless, such evidence is admissible if it tends to establish other matters pertinent to plaintiff's case. The record reveals that such evidence was admitted for the limited purpose of establishing defendant's knowledge of and disregard for the dangerous condition caused by such obstructions. Because the wilfulness of defendant's conduct was in issue, it was proper to admit evidence which tended to show that defendant's conscious disregard for the safety of the public had resulted in yet another accident at the same railroad crossing. See McCormick, Evidence sec. 200, at 474-75 (2d ed. 1972); accord, *Rucker v. Wabash R.R. Co.* (7th Cir. 1969), 418 F.2d 146, 152-53.

Defendant also complains of the admission of testimony elicited to show that the flasher lights at the crossing failed to operate properly on two occasions after the date of the accident. It is clear that faulty operation on a later date does not tend to prove that the flashers were malfunctioning on the date in question. However, the testimony was not introduced for such purpose. It was introduced to rebut the expert testimony of a defense witness who opined that it was impossible for the flasher system to malfunction. For that limited purpose, the testimony was properly admitted.

Defendant maintains that, as a matter of law, Paul Churchill failed to exercise due care in preventing his fatal injury, and defendant's violation of Rule 205 was not a proximate cause of that fatal injury. No special interrogatories were submitted to the jury on these issues; therefore the jury's determination resides in its verdicts against defendant.

On the issue of due care, plaintiff requests that the court hold that contributory negligence is not a bar to recovery under the Public Utilities Act. We need not resolve this as a question of law, for we defer to the jury's determination that Churchill was not, in fact, contributorially negligent. There is, of course, no prophylactic rule of law which directs that any particular act be done or omitted by a passenger finding himself in a position of danger. This court has cautioned:

> " 'What conduct on the passenger's part is necessary to comply with this duty must depend upon all the circumstances, one of which is that he is merely a passenger having no control over the management of the vehicle in which he is being transported. Manifestly, the conduct which reasonable care requires of such passenger will not ordinarily, if in any case, be the same as that which it would require of the driver. While the standard of duty is the same, the conduct required to fulfil that duty is ordinarily different because their circumstances are different.' "
> *Hatcher v. New York Central R.R. Co.* (1959), 17 Ill. 2d 587, 593, quoting *Rhoden v. Peoria Creamery Co.* (1934), 278 Ill. App. 452, 464-65.

Here, the record reflects that Churchill, who was familiar with the crossing, was 62 years old and hard of hearing. There was evidence from a disinterested witness that the flasher lights and bells at the crossing were not in operation when the car in which Churchill was riding entered the crossing. Failure of the lights and bells to function could well constitute an invitation to cross. (*Langston v. Chicago & North Western Ry. Co.* (1947), 398 Ill. 248, 253-54; *Humbert v. Lowden* (1944), 385 Ill. 437, 443.) Certainly, a passenger who is aware that a crossing is equipped with a flasher signal is not negligent as a matter of law if he fails to look up and down the track

for on-coming trains when he had no reason to anticipate a train's approach.

Once the car stalled on the tracks, did Churchill, as a matter of law, fail to exercise reasonable care for his own safety? The evidence reveals that Churchill had only a matter of seconds to extricate himself from the seat belt and to escape harm. The law recognizes that, in a moment of unexpected emergency and imminent danger, a person is not held to the same degree of prudence that is expected of one with time for reflection and deliberation. (*Chicago & Alton R.R. Co. v. Corson* (1902), 198 Ill. 98, 102; *Darby v. Checker Co.* (1972), 6 Ill. App. 3d 188, 194; 1 J. Dooley, Modern Tort Law sec. 4.17, at 97 (1977).) We cannot conclude that Churchill's conduct constituted contributory negligence as a matter of law. Therefore, the jury's determination that Churchill was not contributorially negligent must remain undisturbed.

On the issue of proximate cause, defendant asserts that the stalling of the car on the tracks was the sole proximate cause of the fatality. Defendant does not develop this assertion and actually argues that Churchill's failure to extricate himself from a perilous situation was also a proximate cause of his fatal injury. Defendant's internal contradiction prompts one conclusion: reasonable men could well disagree as to the proximate cause or causes of his death. Therefore, we do not encroach upon the jury's determination that the obstructing boxcars were a proximate cause of the accident.

Defendant also contends that by rejecting nine of its tendered instructions the trial court effectively prevented the jury from considering its theory of the case. Each was a non-IPI instruction, largely repetitive of given IPI instructions which fairly and accurately stated the applicable law. We conclude that the jury was thoroughly and properly instructed on all the issues in dispute.

Defendant, citing *Eggimann v. Wise* (1963), 41 Ill.

App. 2d 471, next argues that the verdicts finding it guilty of negligence under counts I and VII are, in effect, verdicts finding it not guilty of wilful and wanton conduct under counts II and VIII; that since the jury returned verdicts against the defendant under all four counts, the verdicts as to counts II and VIII must be set aside as inconsistent with the verdicts of counts I and VII.

In *Eggimann,* as here, the plaintiff pleaded one count for ordinary negligence and another for wilful and wanton misconduct. The jury, in a single verdict, found against the defendant under both counts. The verdict was reversed because the jury had been instructed as to the burden of proof only under the negligence count and was erroneously instructed as to the form of verdict. The jury was thereby prevented from separately finding for the plaintiff in only one of the two counts presented. In the instant case the jury was given separate instructions and separate verdict forms, and it returned separate verdicts on each count.

Defendant quotes *Eggimann,* saying:

"[N]egligence, and wilfulness are unmixable; a verdict finding the defendant guilty of negligence is, in effect, a verdict finding the defendant not guilty of wilfulness and wantonness; negligence is not wilfulness or wantonness, and wilfulness or wantonness is not negligence: (citations)." (*Eggimann v. Wise* (1963), 41 Ill. App. 2d 471, 483-84.)

We limitedly agree with the rationale in *Eggimann* to the extent that negligence and wilful misconduct are not synonomous. They are not, however, in every instance, mutually exclusive.

When a jury, faced with assessing ordinary negligence or wilful and wanton misconduct, returns a general verdict, it must be presumed that the defendant has been found guilty of wilful and wanton misconduct. (*Trumbo v.*

*Chicago, Burlington & Quincy R.R. Co.* (1945), 389 Ill. 2d 213, 221; *Greene v. Noonan* (1939), 372 Ill. 286, 291.) We cannot reach a lesser conclusion simply because, here, the jury brought in a separate verdict on each count. We will not ignore the jury's intent in returning, on count II, an express finding that the defendant was guilty of wilful and wanton misconduct inasmuch as the pleadings, proof and instruction were proper and commensurate with such verdict. Counts I and II arose from a wrongful death action under which there can be but one recovery. For these reasons, the $45,000 verdict for pecuniary damages under count II must stand.

Finally, defendant claims that the entire verdict under count VIII must be set aside and cannot be cured by remittitur. It first argues that the $45,000 compensatory award under count VIII was the sympathetic response of a jury prejudiced against the defendant by evidence of earlier accidents and the later malfunction of the crossing signals. As we have already indicated, such evidence was properly admitted. The manner in which the case was tried and submitted did not tend to prejudice the jury.

Defendant further argues that the jury's verdicts on counts VII and VIII, regarding the award of compensatory damages, are inconsistent and bear no reasonable relationship to the damages suffered by the plaintiff; that the compensatory damages awarded under count VIII are almost 30 times the damages proved by plaintiff's claim, under the family expense act, under count VII; and that, as a result, the entire verdict under count VIII must be set aside.

Both counts VII and VIII, brought under the Public Utilities Act, allege plaintiff's damages to be those debts incurred under the family expense act—hospital, medical and funeral expenses which resulted from the death of her husband. The evidence at trial proved these expenses, and the jury's verdict on count VII reflected such proof by

awarding plaintiff compensatory damages in the amount of $1,600. Defendant does not quarrel with this finding. Under count VIII, however, the jury awarded compensatory damages in the amount of $45,000. This second award was based upon the same elements of proof allowed plaintiff under count VII. Defendant correctly states the rule of law that a verdict must be set aside where the amount of the verdict bears no relationship to the loss suffered by the plaintiff. Under such rule, that portion of the jury's verdict which awarded compensatory damages of $45,000 under count VIII is in error and must be set aside.

Verdicts are to be liberally construed and may be amended to conform to the pleadings and evidence contained in the record whenever the intention of the jury is clear. (*Manders v. Pulice* (1970), 44 Ill. 2d 511, 517; *Western Springs Park District v. Lawrence* (1931), 343 Ill. 302, 310-11.) Amending a verdict is not the same as entering an order of remittitur. The jury clearly intended to award plaintiff punitive damages, and the record substantiates such finding. Therefore, that portion of the verdict will stand.

For the reasons stated, the judgment of the appellate court is affirmed. The cause is remanded to the circuit court of Sangamon County with directions to enter a judgment for the plaintiff, as administrator, for pecuniary damages in the amount of $45,000; to enter a judgment for plaintiff, individually, for compensatory damages in the amount of $1,600; and to enter a judgment for plaintiff, individually, for punitive damages in the sum of $600,000.

*Affirmed and remanded,*
*with directions.*


MR. JUSTICE RYAN, dissenting:

In this case, and in *National Bank of Bloomington v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 160, we have

been called upon to define the proper office of punitive damages, under the Public Utilities Act in particular (Ill. Rev. Stat. 1969, ch. 111 2/3, par. 77), and to consider the incidental relationship of punitive damages under that Act to recovery under the Survival Act (Ill. Rev. Stat. 1969, ch. 3, par. 339, now Ill. Rev. Stat. 1977, ch. 110½, par. 27—6) and the right of recovery for expenses incurred under the family expenses statute (Ill. Rev. Stat. 1969, ch. 68, par. 15, now Ill. Rev. Stat. 1977, ch. 40, par. 1015). This we are required to objectively do in the emotionally charged climate of two wrongful deaths, keeping in mind that unlike the verdict of a jury, the decisions we reach not only define the law of these cases, but stand as precedent for future related matters which may be less appealing to one's sympathies. I feel that a majority of my colleagues have failed in their performance of this charge and have either intentionally or inadvertently radically departed from principles of law that have had a long history of acceptance, which departure, I fear, will invite further assaults upon accepted limitations on punitive damages and on recovery for wrongful death. I must therefore dissent.

It is not necessary in this dissent to present the complete historical metamorphosis of the doctrine of punitive damages. It is sufficient to note that such damages were early considered in the nature of a compensatory award, then as a combination of compensatory and punitive, and finally, in a majority of jurisdictions, as purely punitive. Although a few jurisdictions still consider the compensatory role of exemplary or punitive damages, since the concept of actual damages has been broadened to include intangible harm, the originally compensatory function of exemplary or punitive damages in most instances has been fulfilled by actual damages. Therefore, most courts today speak of exemplary or punitive damages exclusively in the terms of punishment and deterrence.

Illinois has followed this historical development to this conclusion. (Note, *Exemplary Damages in the Law of Torts,* 70 Harv. L. Rev. 517 (1957).) Although it is well settled that punishment and deterrence are the objectives of punitive damages, the circumstances that warrant such an award are not clear. (McKillip, *Punitive Damages In Illinois: Review And Reappraisal,* 27 DePaul L. Rev. 571 (1978).) I fully agree with the remark of one author who stated that "[t]he punitive damages doctrine, reasonably identifiable at its core, is highly nebulous at its margins" (Long, *Punitive Damages: An Unsettled Doctrine,* 25 Drake L. Rev. 870, 871 (1976)).

The doctrine of exemplary or punitive damages has been severely criticized and four states have, by judicial decisions, completely rejected it. Statutes in some States have eliminated such damages in certain situations. (See *e.g.* Ill. Rev. Stat. 1977, ch. 40, par. 1803 (breach of promise); Note, *Exemplary Damages in the Law of Torts,* 70 Harv. L. Rev. 517, 518 (1957).) The doctrine of punitive damages is not favored by law (*Brown v. Coates* (D.C. Cir. 1958), 253 F.2d 36, Annot., 67 A.L.R.2d 952 (1959)), and the power of giving punitive damages should be exercised with great caution and they should be properly confined within the narrowest of limitations (J. Stein, *Damages and Recovery, Personal Injury and Death Actions* sec. 183 (1972)).

Not only does the established authority require that punitive damages be confined to the narrowest limits but in our cases we are considering the allowance of punitive damages as provided for in the provisions of section 73 of the Public Utilities Act (Ill. Rev. Stat. 1969, ch. 111 2/3, par. 77). Being statutory in nature, there are further limiting considerations. This court has held that the Public Utilities Act is in derogation of the common law and nothing is to be read into it by intendment (*Consumers Sanitary Coffee & Butter Stores v. Commerce Com.*

(1932), 348 Ill. 615, 618). In *Anderson v. Board of Education* (1945), 390 Ill. 412, 422, this court held that a statute creating a new liability must be strictly construed in favor of the persons sought to be subjected to its operation. Section 73 of the Public Utilities Act creates a statutory authorization for the award of punitive damages and in our cases under these authorities must be strictly construed in favor of the railroad.

In spite of these accepted principles requiring a narrow application of the allowance of punitive damages and a strict construction of section 73, the opinions in this case and in *National Bank of Bloomington* leave me with the distinct impression that the majority of this court has been deliberately searching for some basis which logically will support awards of punitive damages and, at the same time, circumvent the prohibition previously acknowledged by this court against the awarding of punitive damages under the Wrongful Death Act (Ill. Rev. Stat. 1977, ch. 70, par. 1 *et seq.*), and under the Survival Act (Ill. Rev. Stat. 1977, ch. 110½, par. 27—6). In this case, the opinion finds that the family expense statute (Ill. Rev. Stat. 1969, ch. 68, par. 15, now Ill. Rev. Stat. 1977, ch. 40, par. 1015) provides the means for awarding punitive damages for a wrongful death. I am convinced that by the use of this device and the strained construction of the Survival Act in *National Bank of Bloomington,* these opinions have opened the door for the award of punitive damages in almost every wrongful death action involving a public utility and for an assault generally upon the prohibition against punitive damages in wrongful death cases in general. As appealing, and possibly as justified, as that result may be, it is a change which the legislature should make in the Wrongful Death Act, which has always spoken strictly in terms of compensatory damages and has been so construed.

Although the opinion speaks of the "very real

damages" Mrs. Churchill suffered in the amount of $1,600 property damages as a consequence of her husband's death, as being the basis for punitive damages, there can be no doubt that punitive damages in this case were not awarded to her because of the conduct of the railroad in causing her a $1,600 property loss. The punitive damages were awarded to her because her husband was killed as a result of the alleged wrongful conduct. If the jury were to consider a $1,600 property loss of the wife, divorced from any consideration of the wrongful death of her husband— let us say for damages to her automobile in that amount—an award of $600,000 punitive damages would be ludicrous.

The jury in this case, being unfamiliar with the niceties of the distinction between an award for family expenses and an award for wrongful death, plainly awarded punitive damages for the wrongful death and not for the wife's property damage. Counts I and II were both wrongful death counts and in both the jury awarded $45,000. Count VII was an action by the wife individually to recover expenses for which she was obligated under the family expense statute. The jury awarded her $1,600. In count VIII the wife sought recovery for her expenses under the family expense statute, as she did in count VII, and also for punitive damages. The jury verdict in this count awarded compensatory damages, not in the amount of $1,600 which they allowed in count VII, but $45,000, which was the amount of damages they awarded for wrongful death in counts I and II. They then added to this amount $600,000 punitive damages. Plainly, the jury awarded punitive damages for wrongful death and not because the wife had suffered "very real damages" under the family expense statute.

Generally, punitive damages are allowed only to the immediate person receiving the injury. (*Fleming Oil Co. v.*

*Watts* (Tex. Civ. App. 1946), 193 S.W.2d 979; *People v. Superior Court of Los Angeles County* (1973), 9 Cal. 3d 283, 507 P.2d 1400, 107 Cal. Rptr. 192; *Dugar v. Happy Tiger Records, Inc.* (1974), 41 Cal. App. 3d 811, 116 Cal. Rptr. 412; *French v. Orange County Investment Corp.* (1932), 125 Cal. App. 587, 13 P.2d 1046; 22 Am. Jur. 2d *Damages* sec. 254; J. Stein, *Damages and Recovery, Personal Injury and Death Actions* sec. 189 (1972).) The majority opinion holds that the wife can recover punitive damages because of her obligation to pay the expenses occasioned by her husband's death; however, it has been held in an action for consequential damages resulting from the injury to a wife that the husband can recover compensatory damages only, and cannot recover punitive damages. (*Martin v. Story* (Fla. Dist. Ct. App. 1957), 97 S.2d 343; *Moran v. Stephens* (Fla. Dist. Ct. App. 1972), 265 S.2d 379; 41 Am. Jur. 2d *Husband and Wife* sec. 455.) In *Hughey v. Ausborn* (1967), 249 S.C. 470, 154 S.E.2d 839, the husband sought to recover punitive damages for medical expenses incurred by him as a result of injuries to his wife and son in an automobile accident. The Supreme Court of South Carolina held that punitive damages could be recovered only by the parties directly injured, the wife and son. The father's recovery for the consequential damages he suffered as a result of those injuries was confined to his pecuniary loss, and he could not recover punitive damages. This appears to be the holding in most of the jurisdictions that have considered this question. (See Annot., 25 A.L.R.3d 1416 (1969).) It was also the holding in an early Illinois appellate case. In *Baltimore and O. S.-W. Ry. Co. v. Keck* (1899), 89 Ill. App. 72, a father sought to recover damages he suffered as a consequence of an injury to his son when the son's foot caught in a railroad crossing and he was injured by an oncoming train. The court held that the father was entitled to recover only

the loss he sustained on account of the injury to his son, including medical expenses. He could not recover exemplary damages.

The recovery in our case is sought not under the common law but under the provisions of section 73 of the Public Utilities Act, which provides that in the event of a violation of the Act or of a rule, regulation, order or decision of the Commission by the public utility, it shall be liable "to the persons or corporations affected thereby" (Ill. Rev. Stat. 1969, ch. 111 2/3, par. 77) and if the act or omission is found to be wilful, exemplary damages may be awarded. This provision presents the question of whether the limitations on the award for punitive damages under the common law, as stated in the authorities cited above, prohibit the recovery of punitive damages under the Act by those who have suffered only consequential damages as a result of a violation by the utility.

Although I have found no cases directly in point, there are several cases which hold that statutes similar to section 73 of our Public Utilities Act are merely declarative of the common law and confer no right upon citizens which they would not already have by reason of the common law. This was the holding in *Cole v. Arizona Edison Co.* (1939), 53 Ariz. 141, 86 P.2d 946, in which the Arizona Supreme Court construed a statute of that State which was almost identical to section 73 of our Public Utilities Act. That statute is now found in 12 Arizona Revised Statutes Annot., sec. 40—423. Also, in *Downs v. Sulphur Springs Valley Electric Cooperative, Inc.* (1956), 80 Ariz. 286, 297 P.2d 339, the Supreme Court of Arizona again construing the same statute, stated that in a tort action based on negligent conduct the statute merely reaffirms and reiterates the common law. Indiana has a statutory provision similar to our section 73 except it does not provide for the recovery of punitive damages. (Ind. Code Ann. 1973, sec. 8—1—2—107.) In *Trustees of Jennie De*

*Pauw Memorial Methodist Episcopal Church v. New Albany Waterworks* (1923), 193 Ind. 368, 140 N.E. 540, the Supreme Court of Indiana held that the statute would not enlarge the rights possessed under the common law. In *H.R. Moch Co. v. Rensselaer Water Co.* (1928), 247 N.Y. 160, 159 N.E. 896, in construing the provisions of a New York statute which imposed a duty upon the utility to furnish water upon demand, Chief Justice Cardozo, writing for the court, stated that if the defendant may not be held for a tort at common law, there was no reason for holding that it may be held under the statute.

The general rule is that statutes authorizing the recovery of punitive damages must be strictly construed and that such damages cannot be awarded unless the giving provision of the statute expressly or by clear implication confers the right to such damages. (*Downs v. Sulphur Springs Valley Electric Cooperative;* Stein, *Damages and Recovery, Personal Injury and Death Actions* sec. 183 (1972).) The majority opinion in our case finds that Mrs. Churchill is a "person affected" by a violation of the Act because of her "very real damages" under the family expense statute. (73 Ill. 2d at 139-40.) The Public Utilities Act should not be so broadly construed. The damages she suffered were only consequential damages which, under the common law, would not support an award of punitive damages. The term "affected" by a violation is used in the Act instead of the words "injured" or "damaged" because of the many kinds of activities covered by the Public Utilities Act and the regulations. Certainly, it was not the intention of the legislature to extend the right to recover under section 73 to every person or corporation that may be consequentially "affected" by a violation of the Act. The term "affected" under the general rule, should be narrowly construed to mean no more than the person *directly* injured or "affected" as a result of the violation. If we extend the right of recovery, as did the majority

opinion, then in the event that Mr. Churchill would not have been killed, he could have maintained an action under section 73 for punitive damages because of his direct injury, and his wife, as one "affected" by virtue of her consequential damages would have an equal right to maintain an action for punitive damages. The language of the statute does not expressly, or by clear implication, grant the right to punitive damages or even the right to maintain an action for damages to those who are only indirectly or consequentially "affected." I do not believe that, through construction, the right of action under section 73 should be extended that far.

All of the authorities referred to above establish the principles that .punitive damages are to be narrowly awarded; that penal statutes and statutes in derogation of the common law are to be strictly construed, and that punitive damages provided by statute should not be awarded unless the statute expressly, or by clear implication, confers the right to such damages. These established principles lead me to the conclusion that punitive damages under section 73 should be awarded only to those who are directly or immediately injured by the violation and not to those who are only consequentially affected, as was Mrs. Churchill in this case. As for her right to recover her consequential damages, this right she possesses under the common law by virtue of the wrongful injury and death occasioned by the railroad.

Not only is a limited application of the Act, which I urge, in keeping with the generally accepted principles noted above, but there is no need for a more expansive interpretation. We should keep in mind that punitive damages *are not compensatory,* but are awarded solely to punish the utility for the conduct which caused the injury and to deter it and others from similar conduct in the future. The recovery of punitive damages, therefore, constitutes a windfall to a recipient. It is my belief that

such a windfall should be awarded only to those who are directly injured as a result of the violation and not to someone who is only consequentially affected. This is particularly true where there are other adequate means of accomplishing the same twin purposes of punishment and deterrence. Why should a person who suffers a $1,600 property loss as a consequence of a direct injury to someone else receive a windfall of $600,000 when by a proper enforcement of existing statutes the penalty could be recovered for the benefit of the public?

Deterrence or a prevention of the wrongfull conduct under the facts of our case can be accomplished by the use of section 75 of the Public Utilities Act (Ill. Rev. Stat. 1969, ch. 111 2/3, par. 79), which authorizes the Commerce Commission to bring an action for *mandamus* or injunction against a public utility for the purpose of stopping or preventing any violation. Not only is the Commission authorized to do this, but the statute states the Commission *shall* commence an action in such cases. If the Commission fails to take the necessary steps to prohibit the violation it would appear that an action for *mandamus* would lie to compel it to do so. See *City of Wheaton v. Chicago, Aurora and Elgin Ry. Co.* (1954), 3 Ill. App. 2d 29; *People ex rel. Schweder v. Brady* (1915), 268 Ill. 192.

The objective of punishing the railroad for such violations can be accomplished by the use of sections 76 and 77 of the Act (Ill. Rev. Stat. 1969, ch. 111 2/3, pars. 80, 81), which provide that public utilities may be fined not less than $500 nor more than $2,000 for each offense; that every violation shall constitute a separate offense; and in case of a continuing violation, each day's continuance shall be a separate and distinct offense. If, as plaintiff contends in support of the charge that this was an aggravated situation, the railroad has permitted the obstruction of this crossing for a number of years, the fine

assessable under sections 76 and 77 could be as much as, if not more than, the punitive damages awarded in this case. In view of the availability of these adequate means of accomplishing the objectives of deterrence and punishment, I cannot see the necessity of diverting the penalty from the public treasury and conferring it in the form of a windfall award of $600,000 on a person who has suffered only a consequential property damage of $1,600.

Although the question concerning the verdict is not within the primary thrust of this dissent, I wish to briefly again refer to the confusion of the jury as manifested by the verdict returned as to count VIII. As previously noted, the verdict indicates that punitive damages were allowed for wrongful death and not for the family expenses incurred by the wife. The majority opinion, in what I consider to be a rather cavalier manner, simply struck that portion of the verdict that awarded $45,000 compensatory damages and permitted the remainder of the verdict to stand. A court has no authority to amend a verdict as to a matter of substance (89 C.J.S. *Trial* sec. 515), such as here striking the award of all compensatory damages. An amendment must be such as to make the verdict conform to the real intent of the jury. The jury's actual intent, and not the court's idea of what the jury ought to have intended, is the end that must be accomplished by the amendment. (*Roadruck v. Schultz* (1948), 333 Ill. App. 476.) The fact that the jury awarded punitive damages in conjunction with compensatory damages of $45,000 and not $1,600 clearly shows that the punitive damages were awarded for wrongful death. The majority opinion justifies the amendment by stating that "[t]he jury clearly intended to award plaintiff punitive damages." (73 Ill. 2d at 148.) With this I agree, but the jury, at least as I see it, plainly intended to award those punitive damages to the plaintiff for wrongful death of her husband. I fear that this opinion establishes dangerous precedent concerning

authority of a court to tamper with and alter verdicts, and to invade the province of the jury.

In conclusion, to avoid a misconception, I wish to state that I do not oppose the general principle of punitive damages, nor do I join in their general condemnation. (See Long, *Punitive Damages: An Unsettled Doctrine*, 25 Drake L. Rev. 870, 888 (1976).) In *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, I authored an opinion which created a cause of action for punitive damages in a factual situation wherein I felt they were required. In situations where the conduct is reprehensible and the penalties otherwise provided are inadequate to either deter or to punish, punitive damages may serve a useful public purpose. Since their purpose is to serve the public functions of punishment and deterrence and not the private purpose of compensation to an injured person, I do not believe punitive damages should be awarded as a windfall to someone who is not directly injured by the extreme conduct which is the basis for the award. Therefore, attempting to view this case objectively, divorced from any consideration of the wrongful death involved, I cannot agree with the expansive treatment accorded section 73 of the Public Utilities Act by the opinion of this court.

MR. JUSTICE UNDERWOOD joins in this dissent.