**MEDCOM HOLDING COMPANY, Plaintiff–Appellant, Cross–Appellee,**

v.

**BAXTER TRAVENOL LABORATORIES, INC. and Medtrain, Inc., Defendants–Appellees, Cross–Appellants.**

Nos. 95–3541, 95–3599.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 26, 1996.

Decided Feb. 14, 1997.[*]

---

* The opinion in this case was originally published on November 7, 1996. Thereafter, on November

21, 1996, each side filed petitions for rehearing and suggestions for rehearing en banc. The panel grants the petitions for rehearing and this opinion is substituted in its entirety for the opinion published November 7, 1996. No judge in regular active service voted to grant the suggestions for rehearing en banc. Therefore, the suggestions for rehearing en banc are now each denied.

The Honorable Walter J. Cummings did not participate in the consideration of the suggestions for rehearing en banc.

Irene Savanis, Daniel E. Reidy (argued), Jones, Day, Reavis & Pogue, Chicago, IL, for Medcom Holding Company in No. 95–3541.

Kathleen L. Roach, David F. Graham (argued), Roger F. Lewis, Sidley & Austin, Chicago, IL, Irving B. Levinson, Holleb & Coff, Chicago, IL, for Baxter Travenol Laboratories, Inc., Medtrain, Inc. in No. 95–3541.

Irene Savanis, Daniel E. Reidy (argued), Jeffrey J. Mayer, Jones, Day, Reavis & Pogue, Chicago, IL, for Medcom Holding Company in No. 95–3599.

Kathleen L. Roach, David F. Graham (argued), Roger F. Lewis, Sidley & Austin, Chicago, IL, Donald A. O'Brien, Hardesty, Wolf & O'Brien, Chicago, IL, Irving B. Levinson, Holleb & Coff, Chicago, IL, for Baxter Travenol Laboratories, Inc., Medtrain, Inc. in No. 95–3599.

Before ESCHBACH, COFFEY, and MANION, Circuit Judges.

ESCHBACH, Circuit Judge.

Plaintiff-Appellant, Cross–Appellee Medcom Holding Company ("MHC") filed a five-count complaint against Defendants–Appellees, Cross–Appellants Baxter Travenol Laboratories, Inc. and Medtrain, Inc. ("Baxter" collectively) in November 1987. MHC alleged that Baxter engaged in a scheme to defraud MHC in the September 1986, sale of the stock of Medcom, Inc. ("Medcom"). This complaint has already resulted in three jury trials in the district court over the course of eight years and only one issue has come before this Court previously, on interlocutory appeal. *See Medcom Holding Co. v. Baxter Travenol*, 984 F.2d 223 (7th Cir.1993). We assume familiarity with that decision. These cross-appeals, however, raise a number of new issues.

### I. The Stock Purchase Agreement and Sale of Medcom

Baxter acquired Medcom in a stock purchase for more than $50 million in May of 1982. Medcom's primary business was the production and distribution of audiovisual and written training material for health-care providers and consumers, both in the United States and abroad. Medcom's subsidiary, Entertainment Partners, Inc. ("EPI"), also produced general entertainment films for television. Baxter owned Medcom for four years. During that time, Medcom suffered significant operating losses.

In 1986, Baxter sold to MHC all of the outstanding capital stock of Medcom for $3.77 million pursuant to a Stock Purchase Agreement (the "SPA"). In the SPA, Baxter made several representations and warranties as of the date of the SPA and as of the date of closing. The representations and warranties include the following: that no material fact was undisclosed that was necessary to prevent previous statements from being misleading; that all representations, statements, and information provided to MHC (including the schedules and financial statements contained in the SPA) were true in all material respects; and that Baxter would pay the amount of any overstatement in the September 30, 1986, balance sheet, which it represented had been prepared in accordance with

generally accepted accounting principles ("GAAP").

Subsequent to MHC's purchase of Medcom, MHC discovered various facts that it claims were part of a scheme by Baxter to defraud MHC. In particular, MHC alleged that Baxter falsely represented and warranted that Medcom had a balance sheet with $10 million in assets at book value when Baxter knew that Medcom had a pertinent asset value of only $1 million. Among other evidence of this alleged scheme to defraud, MHC pointed to evidence that Baxter had written down Medcom's assets to a total of $1 million in precisely the same manner as the two earlier write downs, but this time the write-down was reflected only on the Medcom accounting records held at Baxter's corporate offices. It was not reflected on Medcom's September 30, 1986, balance sheet given to MHC. MHC also pointed to evidence that Medcom's Chairman and CEO, Robert Funari, had prepared an analysis of the realizable value of Medcom's assets that was several million dollars less than the value represented to MHC and that A.D. Little, a valuation firm, had conducted a preliminary appraisal that indicated that Medcom's assets were worth only $2.5 million.

Baxter presented testimony that Medcom's balance sheet was accurate, fairly presented, and in accordance with GAAP. Baxter also presented evidence that A.D. Little's valuation was a preliminary, unissued draft and did not include substantial fixed assets that were included in the sale to MHC. Baxter also produced testimony that Funari's personal valuation was based on market value, whereas the balance sheet concerned book value.

MHC alleged that Baxter had falsely represented the status of Medcom's marketable domestic training programs. The June 1986 offering memorandum for the stock, the "Blue Book," stated that Medcom had a "current library" of over 1600 audiovisual training programs that it marketed in the United States for nurse, physician and consumer health education. The Blue Book also stated that the Famous Teachings in Modern Medicine ("FTMM") and the Video Journal of Medicine Series for Physician Education

"currently contain[ ] over 500 active programs...." MHC alleged that two-thirds of the programs were neither "current" nor "active" and could not be sold for current medical instruction. Baxter argued that the Blue Book simply contained an accounting of the number of programs, not a representation as to the contents or marketability of the programs. Baxter also countered MHC's claim with evidence that the vast bulk of programs in Medcom's library were "ethically saleable" in 1986.

MHC alleged that Baxter falsely represented in the Blue Book the existence of a pending $3 million sale of programs to the Daharan Medical Center in Saudi Arabia. Baxter did not disclose that it had information that this sale would not take place and that the sale of any additional programs in Saudi Arabia was unlikely. MHC further alleged that Baxter failed to disclose that millions of dollars worth of previous sales were the results of bribes, not the quality of the product. Baxter introduced evidence that prospective buyers were told "that they should put no value on the Saudi Arabian business when looking at Medcom." (R. 658-4 at 384.)

MHC also alleged that Baxter did not disclose that the Saudi programs had been the subject of a law suit brought by Medcom's founder, Richard Fuisz, (the "Fuisz litigation") against Baxter and Medcom, alleging improper payments to Saudi officials and their family members. Nor did Baxter disclose that the settlement of the suit subjected the purchaser of Medcom to potential liability. Baxter produced evidence that the Fuisz litigation was settled before Baxter sold Medcom to MHC, Baxter was responsible for payment of the settlement, and Baxter was bound by the confidentiality provisions of the settlement agreement. Therefore, Baxter was not obligated to disclose the litigation.

MHC alleged that Baxter misrepresented in the June 1986 Blue Book the existence of a newsletter joint venture with the UCLA teaching hospital despite the fact that Baxter already had cancelled this venture by letter in April 1986. Baxter claimed that Medcom had simply given notice to UCLA that Medcom would terminate its contract with UCLA

effective October 31, 1986. Baxter claimed that notice was given once Baxter decided to sell Medcom so that any future buyer would not be contractually obligated to keep publishing the unprofitable newsletter.

MHC also alleged that Baxter had breached the SPA as it related to Medcom's stock in EPI. Under the SPA, Baxter was obligated to transfer certain stock in EPI to MHC. Baxter did not transfer this stock until the district court ordered it to do so. This Court affirmed that order of specific performance in *Medcom Holding Co.*, 984 F.2d 223. The parties now dispute what amount of equitable compensation MHC should receive based on Baxter's possession beyond the date the stock should have been transferred pursuant to the SPA.

Based on these and other similar claims, MHC alleged that Baxter had schemed to defraud MHC and was liable for damages on a number of theories. Baxter disputed all the claims and argued both that it was not liable and that it had caused MHC no damages.

## II. Procedural History

The first trial, *Medcom I*, took place over the course of six weeks in 1990. Of the five counts in MHC's original complaint, only three of the counts were tried: Count I alleged violations of Section 10–b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5 (collectively "Rule 10b–5"); Count IV alleged fraud under Illinois common law; and Count V alleged breach of contract. The *Medcom I* jury found Baxter liable on all three counts and awarded to MHC compensatory damages in the amount of $5,725,000 and punitive damages in the amount of $10,000,000. The jury also specifically found that Baxter breached the SPA as it related to EPI.[1]

On the special verdict form, the jury made specific findings on actual damages. The jury awarded $3,500,000 on MHC's claims relating to Medcom's domestic programs and $2,225,000 on MHC's claims relating to Med-

com's September 30, 1986 balance sheet. The jury awarded zero damages on MHC's claims regarding the UCLA Newsletter, the FTMM physician programs, and Medcom's Saudi Arabian operations. The *Medcom I* jury further broke down these awards to $1 million on Count I, $3 million on Count IV and $1,725,000 on Count V.

Baxter brought a post-trial motion for judgment notwithstanding the verdict or for a new trial. The district court granted the motion in part and denied it in part. The district court sustained the liability verdict on all three counts, noting that there was sufficient evidence to support the jury's verdict of common law fraud, Rule 10b–5 fraud and breach of contract with respect to both the domestic programs and the balance sheet. The district court, however, vacated the compensatory damages award, granting Baxter a new trial on damages (but not on liability) and reserved ruling on the award of punitive damages. The court later issued a specific performance decree requiring Baxter to transfer EPI to MHC.

The second trial, *Medcom II*, took place over the course of two weeks in 1991 and was limited to the two specific damages claims for which the *Medcom I* jury had awarded compensatory damages. MHC sought $9,000,000 for the balance sheet overstatement and $4,300,000 for the domestic programs' lost profits. The jury returned an award of $9,000,000 for the 10b–5 fraud, an award of $4,300,000 for the breach of contract, and $0 for the common law fraud. The verdict form did not ask the jury to divvy the damages between the balance sheet overstatement and the domestic programs' lost profits.

The district court denied MHC's motion to enter judgment of $13.3 million on the verdict by cumulating the awards. The court determined that the $4.3 million award was reasonable based on the evidence, but found that the jury's $9 million damage award on the Rule 10b–5 claim was insupportable. The court held that there was no rational basis upon which the *Medcom II* jury could have found that the company's value at the time of Medcom's purchase was $9 million

---

1. This finding, and the district court's subsequent grant of specific performance to MHC, were the subject of this court's prior opinion in *Medcom Holding Co.*, 984 F.2d 223.

less than the $3.77 million purchase price. Ultimately, the court found the verdict irreconcilable, stating:

> [MHC] offered the same evidence and the court instructed the jury that the same measure of damages applied to both the fraudulent misrepresentation and breach of contract claims. Yet the jury returned a verdict of "zero" on the fraudulent misrepresentation claim, and a verdict of $4.3 million on the breach of contract claim. Thus, it appears that the verdicts on Counts IV and V are irreconcilable on any rational basis. The court finds that, under all the circumstances, the jury's verdicts on all three damages claims are tainted with error and result in a miscarriage of justice. Accordingly, a new trial is warranted.

(MEMORANDUM OPINION AND ORDER, 3/24/92, 1992 WL 67873 at *4.)

The district court subsequently reconsidered the presentation of evidence regarding liability. On March 3, 1993, the court vacated the *Medcom I* liability verdict because it determined that a damages-only trial was inappropriate. The district court ordered a retrial of both liability and damages, but limited the retrial to the two specific claims for which MHC had initially received compensatory damages from the *Medcom I* jury: MHC's claims relating to Medcom's domestic programs and Medcom's September 30, 1986 balance sheet. The court also granted Baxter judgment as to punitive damages, vacating the *Medcom I* jury's award of $10 million.

MHC then filed a motion seeking to present evidence beyond the two specific claims (*i.e.*, evidence of the Fuisz litigation, the Saudi Arabian operations, etc.) as evidence of Baxter's alleged scheme to defraud both for purposes of liability and damages. The district court denied MHC's motion in its entirety, but indicated that MHC could attempt to introduce this evidence under Rule 404(b) of the Federal Rules of Evidence. In response, MHC filed an offer of proof, which the court denied in its entirety.

The third trial, *Medcom III*, took place between September 15, 1994, and October 4, 1994. The district court excluded all evidence except the evidence related to Medcom's domestic programs and Medcom's September 30, 1986 balance sheet. The *Medcom III* jury returned a verdict in favor of Baxter on all counts. The district court denied MHC's post-trial motions seeking reconsideration of the district court's prior orders and reinstatement of the prior verdicts or a new trial.

Between *Medcom I* and *Medcom III*, one issue reached this Court on interlocutory appeal. On January 26, 1993, this Court affirmed the district court's specific performance decree regarding EPI. *See Medcom Holding Co.*, 984 F.2d 223. Baxter transferred the EPI stock to MHC on March 3, 1993. The district court then referred the matter to a magistrate judge for recommendation regarding an accounting of the benefits received by Baxter from its wrongful possession of EPI from September 30, 1986, to March 3, 1993. The magistrate judge held a hearing and issued a report. Both parties raised objections to the magistrate judge's recommendations. The district court sustained both parties' objections in part, and entered judgment for MHC in the amount of $1,117,645.

## III. The Parties' Positions on Appeal

MHC raises a host of issues, seriatim. First, MHC requests that we reinstate judgment on the *Medcom I* verdict in its entirety. MHC argues that the district court improperly invaded the jury's province when it vacated the *Medcom I* jury's $5.725 million compensatory damage award because the court concluded that the jury could not have made a rational downward adjustment of MHC's damages computations. MHC also argues that the court improperly substituted its judgment for the jury's when it vacated the award of punitive damages.

Second, and alternatively, MHC urges this Court to enter judgment on the *Medcom II* verdict. MHC contends that the district court erred in vacating the *Medcom II* jury's award of $13.3 million and in vacating the *Medcom I* jury's liability verdict, which the court had originally determined was fully supported by the evidence. Third, MHC seeks a new trial. MHC asserts that the

district court improperly limited MHC's proof of liability and damages in *Medcom III*. In addition, MHC believes that it was entitled to try its punitive damages claim at *Medcom III*. Fourth, MHC seeks prejudgment interest if this Court chooses to reinstate any of the compensatory damage awards. Finally, MHC maintains that the judgment entered against Baxter relating to the EPI accounting must be increased.

Baxter argues that the district court's actions were appropriate and urges this Court to affirm the judgment entered on the *Medcom III* jury's verdicts. Baxter's cross-appeal contends that the $1,117,645 EPI accounting judgment against Baxter was erroneous. Baxter asks this Court to reverse that judgment and eliminate the award entirely or, in the alternative, reduce the judgment to $115,598.

### IV. Analysis

The primary relief sought by MHC is the reinstatement of the *Medcom I* jury's verdicts of compensatory damages in the amount of $5,725,000 and punitive damages in the amount of $10,000,000. More specifically, MHC argues that the evidence supported the jury's award of $3,500,000 on MHC's claims relating to Medcom's domestic programs and $2,225,000 on MHC's claims relating to Medcom's September 30, 1986 balance sheet. Before we reach this issue, we must address Baxter's argument that MHC is precluded from seeking reinstatement of the *Medcom I* jury verdict on compensatory damages.

### A. Waiver

■ Baxter claims that MHC is precluded from seeking reinstatement of the *Medcom I* compensatory damage award by virtue of MHC's post-trial conduct following *Medcom II*. Baxter raises the doctrines of waiver and judicial estoppel. Baxter points out that MHC did not seek a reinstatement of the *Medcom I* verdict following the *Medcom II* trial. MHC asked the district court to enter judgment in the amount of $13.3 million on

the *Medcom II* verdict or grant MHC a new damages trial. The court denied MHC's request to enter a $13.3 million judgment, but it granted MHC's alternative request and ordered a new damages trial. Baxter argues that MHC made a strategic decision not to seek reinstatement of the *Medcom I* verdict and that this strategic decision operates as a waiver. We disagree.

Baxter cites only one case in support of its "waiver" [2] argument: *Heller Int'l Corp. v. Sharp*, 974 F.2d 850, 862 (7th Cir.1992). *Heller Int'l* does not compel the conclusion that MHC has waived its right to seek reinstatement of the *Medcom I* jury's verdict. First, *Heller Int'l* involved the factual question of whether an insurer waived a two-year limitations period for bringing suit that was a condition of the fidelity bond being sued on, thus it was entirely distinct from the "waiver" issue in this case. Second, this Court wrote in *Heller Int'l* that "[w]aiver is the intentional relinquishment of a known right," *id.* at 860, and explained that the intent to waive "should be decisive and unequivocal." *Id.* at 861. The record does not indicate that MHC gave up its right to seek reinstatement of the first verdict, much less that it did so unequivocally. MHC sought to have the verdict reinstated until the district court rejected that option. When the *Medcom II* jury returned a $13.3 million verdict in MHC's favor, MHC sought entry of judgment based on that verdict. In the alternative, MHC suggested a retrial of damages as to the balance sheet and the domestic programs, as well as several other issues not tried in *Medcom III*, including the Saudi program, claims of lost market value, and an additional RICO claim. Nothing indicates that MHC abandoned its belief that the *Medcom I* verdict was appropriate.

■ Likewise, the doctrine of judicial estoppel does not apply to this case. Judicial estoppel is an equitable concept "intended to prevent the perversion of the judicial process. It is to be applied where 'intentional self-contradiction is being used as a means of obtaining unfair advantage....'" *In the*

---

**2.** Baxter's argument is probably more appropriately an argument that MHC *forfeited* the issue, rather than that MHC *waived* the issue. *See*

*United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993).

*Matter of Cassidy,* 892 F.2d 637, 641 (7th Cir.), *cert. denied,* 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990) (internal citations omitted); *see also Ezekiel v. Michel,* 66 F.3d 894, 904 (7th Cir.1995) (requiring "clearly inconsistent" positions for judicial estoppel to apply). There is no self-contradiction in MHC's positions. MHC never sought to vacate the *Medcom I* verdict and MHC never received its alternative request, a retrial on *all* of the issues raised in *Medcom I.* There is no injustice in reviewing MHC's request that we reinstate the *Medcom I* jury's verdict.

## B. Reinstatement of the Medcom I Jury's Verdict

MHC argues that the district court impermissibly substituted its judgment for the *Medcom I* jury's judgment. The district court found that the evidence was sufficient to support the jury's determination of liability. Nevertheless, the court vacated the award of damages because it found that the evidence did not permit the jury "to adjust the amount of damages downward" from the amount of damages sought by MHC. (Memorandum Opinion And Order, 6/29/90, 1990 WL 104039 at *13.) Essentially, the district court presumed that the jury was not capable of understanding the experts' testimony relating to accounting and lost profits well enough to make a downward adjustment of the damages from the amount testified to by MHC's expert.

A closer look at the district court's decision illuminates the issue. The *Medcom I* jury awarded total compensatory damages of $5,725,000. The total award broke down into damages of $2,225,000 for the September 30, 1986, balance sheet overstatement and $3,500,000 in lost profits relating to the domestic programs. After finding that the evidence was not sufficient to permit the jury to adjust the amount of damages downward from the amount sought by MHC, the district court granted a new trial on compensatory damages.

We review the district court's grant of a motion for a new trial on damages for abuse of discretion. *Gasperini v. Center for Humanities, Inc.,* — U.S. —, —, 116 S.Ct. 2211, 2223, 135 L.Ed.2d 659 (1996). At one time, we applied this standard "somewhat more exacting[ly]" when the district court granted a new trial because of Seventh Amendment considerations. *Superbird Farms, Inc. v. Perdue Farms, Inc.,* 970 F.2d 238, 247 (7th Cir.1992). However, in light of the Supreme Court's decision in *Gasperini* that an abuse of discretion standard of review does not violate the Seventh Amendment, — U.S. at ———, 116 S.Ct. at 2223–24, we hereby abandon this practice as unnecessary.[3] Although we now review with somewhat more deference to the district court, utilizing an ordinary abuse of discretion standard, we find that the district court did abuse this discretion.

In this case, the court vacated the damages award on the ground that the damages bore no rational connection to the evidence. A trial judge in the federal system has discretion to grant a new trial if the verdict appears against the weight of the evidence. *Gasperini,* — U.S. at —, 116 S.Ct. at 2222. However, Illinois law governs the substantive assessment of whether the evidence supports the damages awarded when liability is based on Illinois law.

Illinois law governs the damages question in this case. Although the jury found Baxter liable for Rule 10b–5 fraud, a cause of action sounding in federal law, the district court expressly disallowed benefit of the bargain damages under Rule 10b–5 relating to the domestic programs claim. Thus, MHC relied upon its Illinois' common law fraud claim to justify the jury award. Second, MHC relied entirely upon the warranty in the SPA providing that Baxter would pay MHC the amount of any overstatement in the balance sheet to establish damages for the balance sheet overstatement. The award must be

---

**3.** Because this opinion overrules *Superbird Farms, Inc. v. Perdue Farms, Inc.,* 970 F.2d 238, 247 (7th Cir.1992), to the extent that it held that we apply the abuse of discretion standard of review "somewhat more exacting[ly]" when the district court granted a motion for a new trial, it was circulated among all judges of this court in active service pursuant to Circuit Rule 40(e). No judge requested rehearing en banc.

justified by reference to MHC's breach of contract claim. In sum, the trial court had to look to Illinois law for the substantive standard of what evidence would satisfy proof of damages. *Id.* at ———–———, 116 S.Ct. at 2224–25.

The district court found that the evidence was not sufficient to permit the jury to adjust the amount of damages downward from the amount sought by MHC. The court stated that the jury "cannot be expected to appropriately revise [MHC's expert's] model." (MEMORANDUM OPINION AND ORDER, 6/29/90, 1990 WL 104039 at *13.) The district court's finding denigrates the historic and practical abilities of the jury. More importantly, the district court's finding directly contradicts Illinois law.

■ Pursuant to Illinois law, where the existence of damages is established, "the evidence need only tend to show a basis for the computation of damages with a fair degree of probability." *In re Busse*, 124 Ill.App.3d 433, 79 Ill.Dec. 747. 751, 464 N.E.2d 651, 655 (1984). The jury awarded $3.5 million for Baxter's misrepresentations regarding the content of the domestic library and $2.225 million for Baxter's misrepresentations regarding the September 30, 1986 balance sheet. These figures were less than MHC sought and less than the calculations provided by MHC's experts. They were, however, within the reasonable range of valuations testified to by MHC's experts and Baxter's experts. As the Appellate Court of Illinois has noted, the law does not require

> that a jury verdict must match either of two experts' figures, or a combination of the assumptions. Rather, all the law requires is that the evidence tend to establish, with a fair degree of probability, a basis for the assessment of damages....

The ascertainment and assessment of damages is a question of fact for the jury; although the amount may not be speculative, it need not be proved with mathematical certainty. The jury must bring in a verdict within the range of the valuation testimony presented.

.... Where experts differ on the amount of damages there is no rule of law requiring that a jury agree with one or the other or that its award be capable of precise determination. Furthermore, a jury may reduce an expert's damage calculations without invalidating the verdict.

*F.L. Walz, Inc. v. Hobart Corp.*, 224 Ill. App.3d 727, 167 Ill.Dec. 42, 47, 586 N.E.2d 1314, 1319 (1992) (citations omitted). A review of the evidence relating to each category of damages illuminates the district court's erroneous assumptions regarding the jury's capacities.[4]

#### 1. The Domestic Programs Library

■ On a common law fraud claim, Illinois law permits Medcom to be placed in the same financial position it would have been in had the misrepresentation been true. *Brown v. Broadway Perryville Lumber Co.*, 156 Ill.App.3d 16, 108 Ill.Dec. 593, 599, 508 N.E.2d 1170, 1176 (1987). To prove damages for the domestic programs library, MHC had to establish the amount of lost profits from the obsolete programs that Baxter had represented as "current" programs. MHC relied on the testimony of its expert, litigation economist Dr. Steven Schwartz, to establish and to calculate damages. Dr. Schwartz testified that because MHC received fewer "current" programs than Baxter promised, MHC suffered approximately $6,305,000 in lost profits. At trial, Baxter disputed Dr. Schwartz's conclusion that Medcom pos-

---

**4.** Baxter argues that this case is apposite to cases in which damages verdicts were properly vacated because it was impossible to make a reduction based on the damages model offered. *See, e.g., Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499 (7th Cir.1992) (vacating damages award because it had no connection with crucial facts not in dispute); *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1160–66 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) (vacating damages award because damages model did not distinguish be-

tween damages based on unlawful versus lawful conduct). Baxter argues that because the district court found that the damages model was fundamentally flawed with respect to the lost profits claim that the jury could not properly reduce the amount of damages requested on this claim. However, as discussed in Section IV.B.1., *infra*, we reject the district court's holding that the damages model was fundamentally flawed. Hence, cases such as *Zazu Designs* and *MCI* are inapposite.

sessed only 554 current domestic programs in 1986 and claimed that Dr. Schwartz's method of calculating damages was flawed.

The district court found that the jury was entitled to accept Dr. Schwartz's assumption that only 554 programs were current in 1986. The court found, however, that the evidence did not afford the jury an opportunity to adjust the damages downward. The district court's reasoning is perplexing. Dr. Schwartz based his calculation of lost profits on the assumption that all noncurrent programs could achieve the same sales average as the average current program. His analysis was based upon the company's actual 1989 sales. The district court found this problematic because a Medcom employee testified that in 1989, Medcom marketed only the 500 best selling programs. Thus, the district court stated that "Schwartz's thesis that every noncurrent program could be a 'best seller' was unsupported by the evidence." (MEMORANDUM OPINION AND ORDER, 6/29/90, 1990 WL 104039 at *12.) Baxter's expert criticized Schwartz's opinion regarding the number of current programs and the potential sales of noncurrent programs without offering an alternative projection. The district court therefore concluded that the evidence afforded the jury "no basis to adjust the amount of damages downward. Consequently, the $3,500,000 award for the domestic library must be set aside." *Id.* at *13.

First, we agree with MHC that the district court has mischaracterized Dr. Schwartz's testimony. The district court's characterization would be apt if Dr. Schwartz used the average sales figure for the top ten or 100 "current programs" out of the total number of approximately 500 "current programs." But he did not. Dr. Schwartz based his calculations on the assumption that the "noncurrent" programs, had they actually been "current" as Baxter had represented, would have sold as well as the *average* "current" program that Medcom actually sold. Dr. Schwartz testified that there were approximately 500 current programs. The fact that these current programs sold better than the approximately 1000 noncurrent programs is not surprising. It does not, however, change the fact that Dr. Schwartz used the *average*

sales figure for the "current" programs. This rationale is plainly reasonable and does not support the district court's conclusion that Dr. Schwartz assumed that every noncurrent program could be a "best seller."

Apart from our concern with the district court's characterization of the testimony, we must conclude that the district court erred in vacating the jury's award. The court's decision was based on its assumption that the jury was not capable of adjusting the amount of damages downward:

> Schwartz's calculations were based on the palpably errant notion that each noncurrent program could achieve exceptional sales. Schwartz's calculations do not lend themselves to easy adjustment. Medcom failed to offer any analysis based upon reasonable sales expectations, *and the jury cannot be expected to appropriately revise Schwartz's model.*

*Id.* (emphasis added).

We disagree. The court underestimates the jury's abilities. Dr. Schwartz was the subject of lengthy cross-examination. In addition, Baxter's responsive expert discussed Dr. Schwartz's analysis at length. The jury had the information it needed to decide whether Dr. Schwartz's analysis was flawed. Thus, the jury could reasonably adjust the analysis to reflect the percentage of programs that were proven to be "noncurrent" and to reflect the appropriate amount of lost profits from each noncurrent program.

> The jury must bring in a verdict within the range of the valuation testimony presented.
>
> . . . . Where experts differ on the amount of damages there is no rule of law requiring that a jury agree with one or the other or that its award be capable of precise determination. Furthermore, a jury may reduce an expert's damage calculations without invalidating the verdict.

*F.L. Walz, Inc.,* 167 Ill.Dec. at 47, 586 N.E.2d at 1319 (citations omitted). Moreover, under Illinois law, it is not necessary to prove lost profits with absolute certainty; it is permissible to establish "criteria by which the probable profits can be estimated with reasonable certainty." *Havoco of America, Ltd. v. Sumitomo Corp. of America,* 971 F.2d

1332, 1345 (7th Cir.1992) (quoting *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill.2d 306, 113 Ill.Dec. 252, 257, 515 N.E.2d 61, 66 (1987)).

We emphasize that the calculation and assessment of damages is a question of fact that is reserved for the jury. *F.L. Walz, Inc.*, 167 Ill.Dec. at 47, 586 N.E.2d at 1319. Expert testimony may begin the inquiry into damages because it "will assist the trier of fact to understand the evidence or to determine a fact in issue...." Fed.R.Evid. 702. Expert testimony, however, cannot end the inquiry. The jury must determine the facts in issue. The rules of evidence recognize that "an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case" but it is the trier of fact who "appl[ies] them to the facts." Fed.R.Evid. 702, advisory committee notes.

The district court did not apply Illinois law when it determined that the jury was not capable of reducing MHC's expert's damages calculations. When reviewed against the appropriate standard, the verdict is not against the weight of the evidence. The jury reduced the damages award, as it was free to do.

### 2. The September 30, 1986 Balance Sheet

[12] MHC also sought damages based on the $10.6 million balance sheet. MHC relied upon the warranty in the SPA providing that Baxter would pay MHC the amount of any overstatement in the balance sheet. Thus, the district court found that the award must be justified by reference to the breach of contract claim.

MHC produced one witness, Michael Reagan of the accounting firm of Deloitte, Haskins & Sells, to testify to the amount of overstatement. Reagan testified that a 40 percent reduction of the balance sheet was appropriate, resulting in approximately $4.1 million in damages. The jury returned a verdict in the amount of $2,225,000.

Reagan analyzed the balance sheet overstatement line-item by line-item. For each item that he concluded that Baxter had overstated in the balance sheet, he testified as to why he reached this conclusion and by how much Baxter had overstated the value of the asset. Reagan was cross-examined on each balance sheet line-item. He also testified extensively on both direct and cross examination regarding his workpapers, which were provided to the jury as exhibits. In addition, Baxter called an accounting expert, who rebutted each of Reagan's opinions line-item by line-item. Baxter's expert also suggested that Reagan's entire analysis should be rejected and that there were flaws that should lead to partial rejection of some line-items.

The district court again found that the jury was not capable of adjusting the damages award.

> [MHC] asserts that the jury had Reagan's working papers, permitting the jury to determine the proper amount to reduce the balance sheet. These voluminous papers are unintelligible to a lay person. They do not provide guidance to the jury.... [MHC]'s evidence did not permit the jury to adjust its verdict downward if it decided only to partially accept Reagan's qualified opinion that the balance sheet should be reduced by $4,000,000. Since the $2,225,000 verdict is not rationally related to the evidence, the verdict is set aside.

(*MEMORANDUM OPINION AND ORDER*, 6/29/90, 1990 WL 104039 at *14.) Again, the district court's finding contradicts Illinois law and underrates the jury's abilities. The jury's function is to decide which evidence to accept and which evidence to reject. The jury took into account Baxter's numerous challenges to Reagan's analysis and the testimony of Baxter's own expert. The jury then determined that the balance sheet was overstated by only $2,225,000. As MHC points out, there are numerous permutations that would permit the jury to arrive at a verdict of $2,225,000 rather than $4.1 million. *See Wagner v. City of Chicago*, 254 Ill.App.3d 842, 193 Ill.Dec. 676, 689, 626 N.E.2d 1227, 1240 (1993) ("A jury's award will not be subject to remittitur where it falls within the 'flexible range' of conclusions which can be reasonably supported by the facts."), *aff'd*, 166 Ill.2d 144, 209 Ill.Dec. 672, 651 N.E.2d 1120 (1995).

Even if we assume that the jury could not run the exact numbers and calculations of Reagan's model with "mathematical certainty" (which we are hesitant to assume), the jury was entitled to "reduce an expert's damage calculations without invalidating the verdict." *F.L. Walz, Inc.,* 167 Ill.Dec. at 47, 586 N.E.2d at 1319. Under the appropriate standard, Illinois law, the verdict is not against the weight of the evidence.

### 3. The *Medcom I* Jury's Count–By–Count Damages Awards

■ Baxter argues that the jury mistakenly divided the total amount of compensatory damages among the three separate counts, and that this mistake provides an independent basis for affirming the court's ruling vacating the compensatory damage awards. As the district court noted:

> The special verdict form required the jury to indicate the amount of damages it desired to award under the rule 10b–5 claim, the fraud claim and the breach of contract claim. The next instruction on the special verdict form required the jury to indicate the total compensatory damages award. The jury apparently reasoned that the sum of the separate awards for the three counts must equal the total award. The jury awarded $1,000,000 under rule 10b–5 (Count I), $3,000,000 for common law fraud (Count IV) and $1,725,000 for breach of contract (Count V). The jury awarded total compensatory damages of $5,725,000. Since the court has ordered a new trial on the issue of compensatory damages, issues arising from the jury's allocation of damages among the three counts are moot.

(MEMORANDUM OPINION AND ORDER, 6/29/90, 1990 WL 104039 at \*15 n. 8.) Because this Court has found that the district court erred in ordering a new trial on compensatory damages, the issue is now before us.

Baxter argues that count-by-count awards evidence real confusion by the jury regarding the standards it was supposed to apply in two instances. First, there is no rational explanation for the difference in jury awards on Count IV and Count V, because the jury was instructed that the same benefit of the bargain measure of damages applied to both counts. Baxter believes that the award should have been the same, and to the extent it was different, the Count IV award should have been smaller, because that count (common law fraud) had additional elements and a higher burden of proof than Count V (breach of contract). Second, as the district court noted, MHC relied upon the warranty in the SPA providing that Baxter would pay MHC the amount of any overstatement in the balance sheet. "Accordingly, the award must be justified, if at all, by reference to [MHC's] breach of contract claim." (MEMORANDUM OPINION AND ORDER, 6/29/90, 1990 WL 104039 at \*13.) Yet the jury awarded MHC $500,000 more on the balance sheet claim than it did on the corresponding count for breach of contract.

We recognize that the jury may have been confused by the special verdict form in this regard. In fact, the district court warned counsel prior to submission of the form to the jury that they had agreed upon a confusing special verdict form. This confusion does not require vacating the jury's award of damages, however, because the jury's intent was clear. *See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment."); *see also Congregation of the Passion v. Touche Ross & Co.,* 159 Ill.2d 137, 201 Ill.Dec. 71, 87-88, 636 N.E.2d 503, 518–19 (holding damages verdict need not be vacated because of inconsistency in awards between counts when jury's intent was clear and remittitur cured excessiveness), *cert. denied,* —— U.S. ——, 115 S.Ct. 358, 130 L.Ed.2d 312 (1994); *Churchill v. Norfolk & Western Railway Co.,* 73 Ill.2d 127, 23 Ill. Dec. 58, 67, 383 N.E.2d 929, 938 (1978) ("Verdicts are to be construed liberally and may be amended to conform to the pleadings and evidence contained in the record whenever the intention of the jury is clear."); *Anderson v. Smith,* 91 Ill.App.3d 938, 47

Ill.Dec. 638, 641, 415 N.E.2d 643, 646 (1980) (defect in jury may be corrected when the jury's intention is clear).[5] At three times— by actual total, by claim, and by count—the jury indicated an intent to award total damages of $5,725,000. In addition, the jury indicated that the damages amounted to $3,500,000 for the domestic programs claim and $2,225,000 for the balance sheet overstatement. The jury was not confused as to how much damages it was awarding. As the district court noted, "[t]he jury apparently reasoned that the sum of the separate awards for the three counts must equal the total award." (MEMORANDUM OPINION AND ORDER, 6/29/90, 1990 WL 104039 at *15 n. 8.) These awards have a reasonable basis in the evidence and are not against the weight of evidence. Because the jury's intent is clear, the confusion with regard to the special verdict form does not invalidate the award.

### C. Punitive Damages

MHC also seeks reinstatement of the *Medcom I* jury's award of $10 million in punitive damages. The district court found no evidentiary basis for an award of punitive damages and granted Baxter's motion for judgment as a matter of law as to the $10 million punitive damages award. We review *de novo* the district court's granting of judgment as a matter of law, applying the same standard of review as the court below: Whether the evidence is sufficient to support the verdict when viewed in the light most favorable to the party winning the verdict. *Mathewson v. National Automatic Tool Co.,* 807 F.2d 87, 90 (7th Cir.1986).

 Illinois law governs the substantive standard regarding when punitive damages are appropriate. See *Hiatt v. Rockwell Int'l Corp.,* 26 F.3d 761, 766 (7th Cir.1994).[6] Case law in Illinois "makes clear that punitive damages should not be awarded absent a finding of culpability that exceeds bad faith." *Maher & Associates v. Quality Cabinets,* 267

Ill.App.3d 69, 203 Ill.Dec. 850, 858, 640 N.E.2d 1000, 1008 (1994), *appeal denied,* 159 Ill.2d 569, 207 Ill.Dec. 518, 647 N.E.2d 1011 (1995). As we have noted, Illinois courts "take rather a dim view of punitive damages, and insist that the plaintiff seeking them demonstrate not only simple fraud, but gross fraud, breach of trust, or other extraordinary or exceptional circumstances clearly showing malice and willfulness." *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.,* 896 F.2d 1035, 1043 (7th Cir.1990) (citations and internal quotation omitted).

 The judge determines whether the evidence, taken in the light most favorable to the plaintiffs, is sufficient to satisfy the standard for punitive damages. *Id.* If it is, then the jury determines the amount of punitive damages. *Id.* In the instant case, the district court held that there was an insufficient evidentiary basis in the *Medcom I* record for a reasonable jury to have found that Baxter's misrepresentations were willful, wanton, or grossly fraudulent. Thus, the court found no basis for an award of punitive damages.

 MHC argues that the court erred because it had twice previously reserved ruling on punitive damages pending the outcome of the damages retrial because it wanted to be able to examine the punitive damages award in the light of the eventual compensatory award. MHC posits that "[o]nce MHC's claim for damages was submitted to the jury, the jury's decision as to whether or not to award punitive damages could not be replaced by a trial judge evaluating witnesses' credibility and resolving factual disputes which was precisely what the district court did here." Pet. Br. at 34. We disagree.

The fact that the district court reserved ruling on the motion does not change or affect the validity of the court's ruling. Nor does the fact that the district court had already submitted the question of punitive damages to the jury. *See id.* (affirming or-

---

5. The jury's decision to allocate a greater amount of damages to Count IV than to Count V may reflect the jury's decision that Baxter's misrepresentations were willful. The jury found that Baxter was liable for punitive damages in the amount of $10 million.

6. *Hiatt* also relies on Illinois law to determine the proper division of tasks between judge and jury in awarding punitive damages. *Id.* We note for clarification that federal law actually governs that issue. *See Mayer v. Gary Partners & Co.,* 29 F.3d 330 (7th Cir.1994).

der vacating punitive damages after they were awarded by jury). MHC does not point to any specific evidence of gross fraud or other "extraordinary or exceptional circumstances," *id.*, in support of its claim that the district court erred. In light of the dim view Illinois courts take of punitive damages, we agree that punitive damages were not warranted. We affirm the district court's order denying punitive damages.

### D. The EPI Accounting

Because we hold that the district court erred in vacating the *Medcom I* jury's award of damages, we need not reach the issues raised regarding *Medcom II* and *Medcom III*. It is appropriate, however, for this Court to address the cross-appeals relating to the EPI accounting. MHC claims that the judgment entered against Baxter after the EPI accounting does not account for all of the EPI benefits that Baxter improperly received. Baxter argues that the judgment entered against Baxter overcompensates MHC in connection with the EPI accounting.

In *Medcom I*, the jury found that Baxter's failure to transfer EPI to MHC on September 30, 1986, breached the SPA. The district court granted specific performance to plaintiff MHC, required Baxter to transfer and deliver all of its stock in EPI to MHC, and ordered Baxter to account for the benefits Baxter received from possession of EPI since September 30, 1986. This Court agreed with the district court that specific performance was an appropriate remedy. *See Medcom Holding Co.*, 984 F.2d 223 (7th Cir.1993). On March 3, 1993, Baxter conveyed the EPI stock to MHC, and on August 31, 1993, the district court referred the EPI accounting to a magistrate judge.

 The district court awarded approximately $1.1 million to MHC. The parties appeal several of the issues presented to the magistrate judge and the district court. The district court's award of equitable compensation following the accounting, like the award of specific performance, is an exercise of equitable discretion that we review for abuse of discretion. *Medcom Holding Co.*, 984 F.2d at 227; *see also Fleming v. O'Donohue*, 306 Ill. 595, 138 N.E. 183, 185 (1923).

### 1. The NBC Fee

 MHC sought approximately $2.3 million in compensation for net cash received by EPI after September 30, 1986, but then transferred to Baxter before the 1993 EPI stock transfer. EPI collected a $2.7 million licensing fee paid by NBC for the rights to the film *The Ted Kennedy, Jr. Story* (the "NBC Fee"). MHC concludes that this cash belongs to it as the rightful owner of EPI after September 30, 1986.

EPI negotiated the NBC Fee in 1985 pursuant to a packaging agreement for the movie. The evidence indicated, however, that the fee really belonged to another Baxter subsidiary, Travenol Laboratories Limited ("TLL"), pursuant to an agreement between EPI and TLL. In early 1986, TLL and EPI entered into a contract that transferred EPI's right to the NBC Fee to TLL. TLL agreed to bear the production costs with respect to the movie. The primary purpose of the agreement was to take advantage of the tax benefits related to TLL's location in the United Kingdom. The district court adopted the magistrate judge's finding that MHC is not entitled to its $2.3 million net cash claim and that Baxter actually suffered a net cash detriment of $244,726 from its ownership of EPI after September 30, 1986.

MHC's argument that the evidence should be interpreted another way does not require discussion. "Should" does not mean "must" and does not evidence an abuse of discretion. One point raised by MHC does merit discussion, however: MHC claims that Baxter made several "admissions" that contradict the district court's findings. First, Baxter stipulated during the EPI accounting proceedings that the NBC Fee was reported as EPI income in the United States and was not reported as TLL income in the United Kingdom. Second, in 1988, when Baxter was resisting MHC's efforts to force it to transfer EPI, Baxter presented to the district court a balance sheet and affidavit that included the NBC Fee as an EPI asset. Third, in all of its U.S. tax returns from 1982 to 1993, Baxter used the same EPI financial statements upon which MHC's expert based his conclu-

sion that the NBC Fee was an EPI asset as of September 30, 1986.

We agree with the district court that EPI's financial statements are simply evidence, not admissions, that EPI actually owned the NBC Fee. "Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel ..." *Keller v. United States,* 58 F.3d 1194, 1198 n. 8 (7th Cir.1995); see also *In re Lefkas Gen. Partners,* 153 B.R. 804 (N.D.Ill.1993) (Binding judicial admissions are "any 'deliberate, clear and unequivocal' statement, either written or oral, made in the course of judicial proceedings."). Because Baxter did not make a formal concession that the NBC Fee was an EPI asset, it made no binding admission to this effect.[7] The financial statements were thus merely evidence to be considered. "[O]rdinary evidentiary admissions ... may be controverted or explained by the party." *Keller,* 58 F.3d at 1198 n. 8. Baxter explained the evidence that was adverse to its defense, and the magistrate judge and the district court were free to accept this evidence.

### 2. Tax Benefits of EPI's Losses

MHC also sought compensation for certain EPI losses totalling $3.6 million. Baxter used these losses to reduce its 1989 federal tax liability by $1,362,371. MHC argued that Baxter gained this tax benefit as a result of its wrongful control over EPI after September 30, 1986. MHC requested an award of $2,275,929—an amount that MHC claims will leave it with a $1,362,371 gain after paying taxes on the award.

The district court found that MHC was entitled to $1,362,371 on the tax benefit claim less Baxter's $244,726 net cash loss as a result of owning EPI after September 30, 1986. The net award was $1,117,645. The court stated that this was an equitable award because it prevented Baxter's unjust enrichment and avoided undue speculation as to what would have occurred had EPI been

transferred in 1986. The award also balanced the fact that the award might make MHC "more than whole" (because MHC had failed to show that use of the $3.6 million in EPI losses since 1986 would have translated into a tax benefit to MHC) against the fact that the court had diminished the award to reflect Baxter's losses.

◼ MHC claims that the district court erred in its award. MHC argues that it is entitled to an award of $2,275,929 to reflect the taxes it will have to pay on the award. As a general matter, a court will not increase an award of damages to compensate for the expected tax liability on the damage award. *Oddi v. Ayco Corp.,* 947 F.2d 257, 267 (7th Cir.1991). We have noted, however, that courts have adopted a pragmatic approach to the award of damages where the defendant's error deprived the plaintiff of tax-free income, rather than *taxable* income. *Id.* MHC claims that the issue is the *after-tax* effect of Baxter's failure to transfer EPI to MHC. Thus, the proper measure of damages takes the after-tax effect of the judgment into account. In the instant case, MHC claims that the $2,275,929 figure is appropriate because it will result in an after-tax benefit to MHC of $1,362,371 and an after-tax loss for Baxter of $1,362,371.

We give great deference to the district court in exercising its equitable discretion. The district court concluded that compensating for tax effects was inappropriate and speculative. In *Oddi,* we noted that the party seeking an increase in an award to reflect tax effects bears the "burden of presenting evidence that shows that he will be liable for the prescribed amount of taxes." *Id.* at 268. We cannot say that the district court abused its discretion in refusing to increase the damage award to reflect potential tax effects.

◼ After noting the very deferential standard of review in contesting MHC's argument, Baxter argues that the district court's accounting was flawed because it awarded too much to MHC. Baxter argues

---

7. This is not to say that Baxter did not make binding judicial admissions through its stipulations to the court. But it admitted only that to which it explicitly stipulated. For example, by stipulating that the EPI income was reported in the U.S., it made a binding judicial admission that the income was so reported. It did not, however, make any binding admission as to how that fact should be interpreted, such as whether the NBC Fee therefore belonged to EPI.

that $2,753,076 of the EPI tax losses claimed by Baxter after September 30, 1986, occurred and were in existence prior to that date. Baxter did not do a balance sheet review of EPI in accordance with GAAP prior to the sale of Medcom to MHC because Baxter did not meet the terms of the SPA. Baxter claims that if it had conducted a balance sheet review as the SPA required, then $2,753,076 of the $3,612,772 in EPI tax losses claimed by MHC necessarily would have been taken by Baxter prior to closing. The district court rejected this reasoning, noting that "to guess what Baxter would have done had Baxter met the terms of a contract that Baxter violated is unwarranted speculation. Moreover, it is clear that Baxter did indeed receive a tax benefit from its wrongful ownership of EPI after September 30, 1986." (MEMORANDUM OPINION AND ORDER, 10/10/95, 1995 WL 609125 at *6.)

When considering the equities of the situation, the district court was entitled to refuse to credit Baxter's speculation as to what it would have done if it had not violated the contract. In addition, the court was not required to speculate as to what effect a proper balance sheet review would have had on MHC's decision making process. The district court did not abuse its discretion.

### E. Prejudgment Interest

The district court did not address the issue of prejudgment interest in connection with the *Medcom I* jury's damages verdict due to the district court's order vacating the verdict. On remand, the district court shall consider the issue. In this regard, the district court shall recognize that MHC concedes that it is not entitled to prejudgment interest on its domestic programs claim because the lost profits analysis conducted for these programs at *Medcom I* included an element of damages recognizing the time value of money. Pet. Br. at 53 n. 11. The district court shall consider an award of interest relating to the balance sheet overstatement.

In Section IV.B.2., *supra*, we upheld the award of damages for the balance sheet overstatement on a breach of contract claim. The breach of contract claim is governed by Illinois law pursuant to the *Erie* doctrine. "In diversity cases governed by *Erie*, federal courts look to state law to determine the availability of (and rules for computing) prejudgment interest." *Matter of Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1333 (7th Cir.1992). Illinois law permits the recovery of prejudgment interest if the parties provide for such interest in an express agreement or if the amount is a fixed amount or easily computed. *Bank of Chicago v. Park Nat. Bank*, 266 Ill.App.3d 890, 203 Ill. Dec. 915, 923, 640 N.E.2d 1288, 1296 (1994); 815 Ill. Comp. Stat. 205/2 (Michie 1993). If any of these prerequisites are met, then the decision to allow statutory interest lies within the sound discretion of the district court. *Bank of Chicago*, 203 Ill.Dec. at 923, 640 N.E.2d at 1296.

Although we remand to the district court the issue of prejudgment interest on the balance sheet overstatement, we address MHC's claim for prejudgment interest on the EPI accounting award. MHC argued that it was entitled to an interest award in order to account for the time value of the benefit Baxter received in 1989 due to EPI's tax losses. The district court noted that Illinois law applies to MHC's accounting claims because MHC's original breach of contract claim relating to the EPI stock was based on Illinois law. Under Illinois law, prejudgment interest is available in cases arising in equity only where the trial court in its discretion determines that such an award is equitable. *In re Estate of Wernick*, 127 Ill.2d 61, 129 Ill.Dec. 111, 123, 535 N.E.2d 876, 888 (1989). The district court considered all of the equities in the EPI accounting, balanced them, and determined that MHC should not be awarded interest. We cannot say that the district court abused its discretion.

MHC, along with costs, requests postjudgment interest in accordance with 28 U.S.C. § 1961. On remand, the district court shall order post-judgment interest to be paid at the statutory rate from the date of the *Medcom I* judgment, March 16, 1990. *See Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1211 (7th Cir.1989).

### V. Conclusion

The evidence at *Medcom I* was sufficient to support the jury's verdicts on liability and on compensatory damages. The district court erred in failing to enter judgment on

these verdicts. Therefore, we vacate the *Medcom III* judgment and remand to the district court to enter judgment on the *Medcom I* jury's verdicts as to liability and as to compensatory damages in the amount of $5,725,000: $3,500,000 on MHC's domestic programs claims and $2,225,000 on MHC's claims relating to the September 30, 1986, balance sheet. Upon remand, the district court shall consider the award of prejudgment interest on the $2,225,000 balance sheet claim. As a result of our decision, MHC's claims of error regarding *Medcom II* and *Medcom III* are moot and we decline to address those claims.

We affirm the district court's denial of punitive damages. We also affirm the district court's award of $1,117,645 pursuant to the EPI accounting.

The district court shall order post-judgment interest to be calculated at the statutory rate. The parties shall bear their own costs in this Court.

AFFIRMED in part, VACATED in part, and REMANDED for further proceedings consistent with this opinion.